UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| ARLENE LOUISE PERKINS and RICHARD PERKINS | ) ) ) | Case No:  1:07cv1185-LG-RHW |
| Plaintiffs, | ) ) | Judge:  Louis Guirola, Jr. |
| vs. | ) ) | Magistrate Judge:  Robert H. Walker |
| UNITED STATES OF AMERICA and ASHBRITT, INC. | ) ) ) | |
| Defendants. | ) ) | Jury Trial Requested |

**MEMORANDUM IN OPPOSITION TO ASHBRITT, INC.'S
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

NOW INTO COURT COME PLAINTIFFS, through undersigned counsel, who respectfully submit that Ashbritt, Inc.'s Motion to Dismiss or for Summary Judgment (Rec. Doc. 38) should be denied for the following reasons.

**I. Ashbritt Cannot Escape Liability by Using the Government Contractor Defense.**

Ashbritt's primary argument for dismissal or summary judgment is the "government contractor defense."  *See* Rec. Doc. 39.  Under the facts of the case *sub judice*, Ashbritt, Inc. operated as an "independent contractor" as described in the Federal tort Claims Act ("FTCA"), and not as a "government contractor" for purposes of the "government contractor defense."

This case arose when Ashbritt, Inc.'s agents exceeded the Right of Entry ("ROE") (see Besse ROE Documents, attached as Exhibit 1) to clear debris from Mr. Brad Besse's property ("Besse site"). When Ashbritt's agents left the Besse site to remove debris from the Perkins's property ("Perkins site"), Ashbritt exceeded its authority, entered the Perkins site without permission, destroyed the Perkins's personal property without permission, and then charged the

government for the unauthorized work.[1]  This rather ordinary trespass does not involve any unique federal interests or a discretionary decision by the government.

## A.   Independent Contractors to the Government are Generally Liable for Their Torts According to the FTCA

The FTCA provides that the United States may be held liable for the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  By its own terms, the FTCA only waives sovereign immunity for injuries caused by an "employee of the Government," 28 U.S.C. § 1346(b)(1), but excludes from that waiver injuries caused by "'any contractor with the United States.'"  *U.S. v. Orleans*, 425 U.S. at 813-14 (quoting 28 U.S.C. § 2671); *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999) (citation omitted) ("The alleged tortfeasor's status as an 'employee of the government' is the sine qua non of liability under the FTCA.").  This provision is known as the independent contractor exception to the FTCA, and it must be given due regard when a court considers whether a contractor is liable and when subject matter jurisdiction exists.  *U.S. v. Orleans*, 425 U.S. at 814; *see also Linkous v. U.S.*, 142 F.3d at 275; *Broussard v. U.S.*, 989 F.2d 171, 174 (5th Cir. 1993) (citation omitted).

"Since the federal government can only be liable to [a] limited extent, it is critical to distinguish between a federal agency and an independent contractor."  *Cooper v. U.S.*, 225 F.Supp. 2d 1 (D.D.C. 2002) (citing *U.S. v. Orleans*, 425 U.S. at 814).  Therefore, a plaintiff must first show that the independent contractor was acting as an "employee of the Government"

---

[1] Ashbritt was paid by the volume of debris removed.  *See* Gregory Corlew Deposition 20:1-9, Rec. Doc 38-7 at 8; Contract, § C2.9.2, Rec. Doc. 38-2 at 23, "Contractor shall be paid based upon an hourly rate per bid schedule or volumetric measurement as specified in the task order."

before the United States may be held liable for the actions of the independent contractor under the FTCA. *Logue v. U.S.*, 412 U.S. 521, 526 (1973). In making this determination, courts have traditionally adopted the principles of agency law, and generally the issue has hinged on whether the United States had sufficient authority over the "detailed physical performance of the contractor" so as to transform the relationship from a contractual one to one of agency. *Id.* at 527-528. The key "is not whether the . . . agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *U.S. v. Orleans*, 425 U.S. at 815. If all the United States retains is the right to inspect the progress of the independent contractor, to provide advice on contract provisions, and to order work stoppage for safety violations, this type of control does not impute liability to the United States. *Alexander v. U.S.*, 605 F.2d 828, 831 (5th Cir. 1979). "[A] party under contract with the government becomes an agency of the United States within the meaning of the FTCA only if the United States supervises day-to-day operations of the party." *Id.* at 833 (citing *U.S. v. Orleans*, 425 U.S. at 815). The United States' contractual reservation of the right to inspect or halt activities of the contract does not "'in itself override or alter the general rule of nonliability for the torts of the contractor . . . .'" *Id.* at 834 (quoting *U.S. v. Page*, 350 F.2d 28, 30 (10th Cir. 1965), *cert. denied*, 382 U.S. 979 (1966)).

Furthermore, Courts have previously held that the government can be liable when its employee acts negligently. *See e.g. Fuller v. Hillyard*, 2002 WL 10524, at *2 (E.D. La. Jan.2, 2002) (holding the government liable for a car accident caused by a FEMA employee operating a government vehicle). This case is no different. At issue is a trespass for which the government would have no immunity if a government employee and government equipment were involved.

As a result, it is not possible for Ashbritt to derive immunity under the FTCA since no such immunity exists.

**B.     The Government Contractor Defense Provides Derivative Immunity for Contractors Only Under Particular, Limited Circumstances**

Defendant Ashbritt, Inc. argues for dismissal or summary judgment based on the government contractor defense.  Courts recognized that the Independent Contractor Exception to the FTCA could lead to injustice, when a contractor becomes liable for merely complying with a government decision. The government contractor defense is based on the doctrine of derivative immunity for private contractors first enunciated by the Supreme Court in *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940) and later expanded in *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988).  The concept of derivative immunity extends to private contractors the immunity traditionally afforded to the government when the government engages in a discretionary governmental function.  *In re World Trade Center Disaster Site Litigation*, 456 F.Supp. 2d 520, 560 (S.D.N.Y. 2006).  The Fifth Circuit has recognized that the purpose of derivative immunity "is to prevent the contractor from being held liable when the government is actually at fault." *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989).  When the contractor's actions are not specifically approved by the government, then the defense does not apply, and the contractor is considered an independent contractor.  *Id.* at 1480.

The government contractor defense provides that contractors hired by the government cannot be held liable for performing their contracts in conformity with specifications established by the government, as long as the contracts are performed with care and without negligence. *Hercules, Inc. v. U.S.*, 516 U.S. 417, 421-22 (1996); *Boyle*, 487 U.S. at 511-12.  In order to invoke the defense, three elements must be proven: (1) the government approved reasonably precise specifications, (2) the government supervised and controlled the implementation of those

specifications, and (3) the contractor was not aware of reasons not known to the government that would make the implementation of the specifications unsafe or unreasonable. *In re World Trade Center Disaster Site Litigation*, 456 F.Supp. 2d at 563; *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). Although the government contractor defense is most commonly asserted by military procurement contractors, courts have held that it is applicable to service contracts with the government. *See Boyle*, 487 U.S. at 506; *Richland-Lexington Airport Dist. v. Atlas Props., Inc.*, 854 F.Supp. 400, 421-22 (D.S.C. 1994); *Guillory v. Ree's Contract Serv., Inc.*, 872 F.Supp. 344, 364 (S.D.Miss. 1994).

**C.    Ashbritt Should be Considered an Independent Contractor, Not a Government Contractor, Under the FTCA.**

Where the contract does not explicitly state the relationship, the critical factor in distinguishing an independent contractor from a government employee or government contractor is "the power of the Federal Government to control the detailed physical performance of the contractor. *Coa v. Wilson*, 2007 WL 4234097, at *3 (E.D. La. 2007). As stated above, Ashbritt must prove: (1) the government approved reasonably precise specifications, (2) the government supervised and controlled the implementation of those specifications, and (3) the contractor was not aware of reasons not known to the government that would make the implementation of the specifications unsafe or unreasonable. *World Trade Center*, 456 F.Supp. 2d at 563; *Kerstetter*, 210 F.3d at 435. (For clarity, Plaintiffs have divided the second prong of this test into two subparts below.)

**1.    *The Degree of Detail in the Government's Specifications Demonstrates that Ashbritt was an Independent Contractor.***

Ashbritt has attached the applicable contract with the U.S. Army Corps of Engineers ("USACE" or "Corps") to its Motion to Dismiss or for Summary Judgment (Rec. Doc. 38-2), and has pointed out a handful of provisions in this contract that support its motion. However, the

contract is clear that Ashbritt has primary authority to determine how to accomplish the general

task of debris removal services paid for by the government.  The contract states that:

- The Contractor shall provide specified equipment, operators, and laborers for debris removal operations as specified in the task order. The contractor shall provide all labor and materials necessary to fully operate and maintain (including fuel, oil, grease and repairs) all equipment under this contract.  Rec. Doc. 38-2 at § C1.2.1, p. 14.

- The Contractor shall provide debris removal crews for each disaster event for the number of days specified..."  Rec. Doc. 38-2 at § C1.2.2, p. 14.

- The Contractor shall conduct the work so as not to interfere with other disaster response and recovery activities of federal, state, and local governments or agencies, or of any public utilities.  Rec. Doc. 38-2 at § C1.2.7, p. 14.

- The Contractor shall supervise and direct the work, using skilled labor and proper equipment for all tasks. Safety of the Contractor's personnel and equipment is the responsibility of the Contractor. Additionally, the Contractor shall pay for all materials, personnel, taxes and fees."  Rec. Doc. 38-2 at § C1.7.2, p. 16.

- The Contractor must be duly licensed to perform the work in accordance with the statutory requirement of the affected state(s). The Contractor shall obtain all permits necessary to complete the work. The Contractor shall be responsible for determining what permits are necessary to perform under the contract.  Rec. Doc. 38-2 at § C1.7.3, p. 16.

- The Contractor shall be responsible for correcting any notices of violations issued as a result of the Contractor's or any subcontractor's actions or operations during the performance of the contract.  Rec. Doc. 38-2 at § C1.7.4, p. 16.

- The Contractor shall be responsible for control of pedestrian and vehicular traffic in the work area. At a minimum, one flag person should be posted at each approach to the work area.  Rec. Doc. 38-2 at § C1.7.5, p. 16.

- The work shall consist of constructing an appropriate reduction site, managing the operations of the reduction site, perform debris reduction by air curtain incineration, and or chipping of debris, excluding concrete, asphalt, masonry and metal.  Rec. Doc. 38-2 at § C2.2.5, p. 19.

- The contractor shall be responsible for all costs associated with the final disposal of non-burnable debris and ash residue.  Tipping fees will be reimbursed by the Government. Disposal of non-burnable debris and ash residue returning the reduction site to near original conditions, upon completion of reduction activities.  Rec. Doc. 38-2 at § C2.2.7, p. 19.

6

- The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires. Rec. Doc. 38-2 at § C52.246-4(b), p. 24.

- If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed. Rec. Doc. 38-2 at § C52.246-4(e), p. 24.

- The contractor shall procure and maintain during the entire period of his performance under this contract the following minimum insurance in accordance with the Contact Clause entitled "Insurance-Work on a Government Installation." Rec. Doc. 38-2 at § H.4. ¶ 1, p. 29.

- The prime contractor is solely responsible to assure the safety of contract personnel in all contract activities that they and their subcontractors perform. The contractor shall also provide and take necessary measures to protect the public and Corps personnel during their activities. Actions may include but are not limited to providing flagman, ground guides, fencing, security guards, traffic control, removal of unsafe equipment and removal of unsafe workers. Rec. Doc. at § H.5. ¶ 1, p. 29-30.

- The contractor shall have a comprehensive Safety and Occupational Health (SOH) program. The contractor shall provide on site staff to provide for a safe work environment and strive to execute this contract without a lost time accident or injury. Rec. Doc. at § H.5. ¶ 2, p. 30.

- **The Contactor is responsible for damage to property caused by defective workmanship.** The Contractor shall promptly segregate and remove from the premises any unsatisfactory facilities, materials, and equipment used in contract performance, and promptly replace them with satisfactory items. If the Contractor fails to proceed at once in a workmanlike manner with performance of the work or with the correction of defective workmanship, the Government may (1) by contract or otherwise, replace the facilities, materials, and equipment or correct the workmanship and charge the cost to the Contractor and (2) terminate for default the Contractor's right to proceed. The Contractor and any surety shall be liable, to the extent specified in the contract for any damage or cost of repair or replacement. Rec. Doc. at § H.5. ¶ 1, p. 29-30. (Emphasis added.)

- The limitation of liability under paragraph (a) above shall not apply when a defect or deficiency in, or the Government's acceptance of, services performed or materials furnished results from willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel. The term "Contractor's managerial personnel," as used in this clause, means the Contractor's directors, officers, and any of the Contractor's

managers, superintendents, or equivalent representatives who have supervision or direction of…All or substantially all of the contractor's operations at any one plant, laboratory, or separate location at which the contract is being performed…" Rec. Doc. at § 52.246-25 (b), p. 89.

- If the Contractor carries insurance, or has established a reserve for self-insurance, covering liability for loss or damage suffered by the Government through the Contractor's performance of services or furnishing of materials under this contracts, the Contractor shall be liable to the Government, to the extent of such insurance or reserve, for loss of or damage to property of the Government occurring after Government acceptance of, and resulting from any defects and deficiencies in, services performed or materials furnished under this contract. Rec. Doc. at § 52.246-25 (c), p. 89.

While the contract gives more detailed specifications in some provisions, a full reading of the entire contract makes it clear that Ashbritt had primary management authority over all day-to-day activities necessary for debris removal and reduction, and the contract should be characterized as that between the U.S. Government and an independent contractor.

### 2A. *The Government Did Not Compel Compliance with the Specifications Ashbritt Relies Upon to Prove Its Government Contractor Defense.*

Furthermore, Ashbritt has provided no evidence establishing that the government actually compelled compliance with the specifications contained in the contract. Although Ashbritt tries to prove that it was under government supervision because Ashbritt was required to submit reports by the close of each business day under Section C1.6.0 (*see* Rec. Doc. 39 at 2), neither the USACE nor Ashbritt has produced any such reports submitted by Ashbritt for any days that Ashbritt's agents worked at the Besse property. Ashbritt has not provided evidence that any of the other specifications in the contract cited in Rec. Doc. 39 were actually enforced or followed. Since Ashbritt bears the burden of production in this regard, this factor weighs against finding that Ashbritt was acting under the government's supervision when it removed debris from the Besse and Perkins properties in February 2006. (*See e.g. Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (holding that this element was satisfied where defendant

was compelled to deliver Agent Orange to the government under threat of criminal sanctions, analyzing whether defendant was government contractor for purposes of § 1442(a)(1) removal.))

> ### 2B.   The Government Did Not Supervise Ashbritt's Performance of the Contract to Such a Degree that Ashbritt May Be Considered a "Government Employee" for Purposes of the Government Contractor Defense

Ashbritt relies heavily on the deposition of the Quality Assurance officer ("QA") at the Besse Site, Gregory Corlew.  Mr. Corlew was the only agent of the USACE present at the Besse property when the activities in dispute took place, was clearly not in a position to supervise and direct Ashbritt's agents.

Mr. Corlew testified at his deposition that the USACE's QAs could not direct the contractor's work:

> [*Counsel for Plaintiffs*] Q. Okay. And what's the job of the quality assurance officer on the site?
>
> A. Quality assurance is – the main thing: The Corps of Engineers had received funding and had contracted debris removal to various contractors...[a]nd the QA was on site...primarily to make sure that the actual debris that the government was paying for to be disposed of was reflected accurately; so that if...a contractor's being paid for 32 cubic yards on a particular truck, 32 cubic yards actually went.
>
> And the QA was also responsible for ensuring that trees that did not need to be cut down, that posed no hazard, or anything that should not go to the dump, should not... In other words, we did not want to generate—it was important that debris that was not generated and that...the only thing that was cleaned up, since we were paying according to the cubic yard and according to the tree, what actually needed to be cleaned up.
>
> And another thing is...as a QA, if I saw something unsafe...I was not permitted to direct the contractor, but my job would be to request the QC, the quality control representative, and let them know.
>
> But basically it was – it was designed to prevent fraud on the debris removal and to ensure that...nobody was going to get hurt, to keep the public out of the way of heavy equipment."

Gregory Corlew Dep., 20:1-25 & 21:1-25 (Rec. Doc. 38-7 at 8-9).  Instead, there was a Quality

Control officer ("QC"), and employee or agent of the contractor, who directed the debris removal

work at the site:

> A.  ...the QC's responsibility was to inform the contractor, I guess, to make sure
> the contractor abided by all the requirements. The QC, he would basically enforce
> safety regulations, that they picked up the debris that they were supposed to. He
> was basically the guy that could talk directly to the contractor.

> [*Counsel for Plaintiffs*] Q. Was the QC an employee of the Corps of Engineers or
> of the contractor?

> A. No, he was normally an employee with the contractor, and that's why he was
> the one authorized to talk to the contractor.

> Q. Okay.

> A. The contractor had a contract with the government, and the QA didn't have any
> supervisory control over the contractor.

> ...

> Q. Okay, so the Corps of Engineers does not have any supervisory authority over
> the performance of the work by the contractor or the subcontractors; is that
> correct?

> A. That's correct.

Gregory Corlew Dep., 22:10-25, 23:1, 24:17-21 (Rec. Doc. 38-7 at 9-10).  Mr. Corlew

reiterated and expanded upon this theme when questioned by Ashbritt:

> [*Counsel for Ashbritt*] Q: And the Corps had supervisory control over the work
> being performed by the contractors, including AshBritt; correct?

> A: No, that's not necessarily correct. There is a distinction. We --

> Q: Okay. What – Go ahead.

> A: We did not have supervisory control over the contractors. We were not
> allowed to direct the contractors. We had to go through the QC. If we saw – had a
> concern with something and we were being ignored by the QC, we would in turn
> call our QA supervisor, who would get a hold of the QC supervisor and take care
> of it. But I didn't have any supervisory control other than requesting the QC.

My main responsibilities were trip tickets, to make sure they were accurate, reflected actual debris, and also little safety things, and to make sure the trucks were, you know, meeting the requirements before they went on the road. That's all.

Q: Would it be – would it be correct to say that your function was to observe the performance of the work being performed and to ensure that it was being performed in conformance with the expectations of the government?

A. Possibly, to some degree. But you've just described the QC's responsibilities. My responsibilities was to make sure the government was getting actual value for the money being paid – in other words, there was no fraud, and actual debris being paid for was actually removed."

Gregory Corlew Dep., 48:7-25, 49:1-14, (Rec. Doc. 38-7 at 20-21).

### 3. *Ashbritt Was in a Position to Be Aware of Problems with the Implementation of the Specifications of the Contract.*

Although Gregory Corlew was at the Besse site, he was not in a position to manage or direct the crew. The QC and other Ashbritt managers had authority over Ashbritt's agents. To the extent that the crew encountered any conditions that made the implementation of the contract unsafe or unreasonable, Ashbritt was in a position to know these problems without sharing that information with the government. Ashbritt was in a better position to know about and fix boundary issues in implementing the ROE at the Besse site.

### D. Ashbritt Failed to Follow Government Specifications, and Cannot Raise the Government Contractor Defense.

Alternatively, to the extent that this Court should determine that the USACE exerted control over the activities and procedures at issue in this litigation, Ashbritt failed to accurately follow government specifications and as such should not be entitled to raise the defense. *See Bynum v. FMC Corporation*, 770 F. 2d 556, 564 (5th Cir. 1985) ("Of course contractors that fail to follow government specifications...are not entitled to raise the defense."). In other words, the mere existence of a contract with the government does allow Ashbritt to seek the benefits of the Government Contractor defense.

The activities and procedures at issue were not controlled by the government or related to the government's specifications. The contract does not specify that Ashbritt may remove debris from properties adjacent to the ROE for 123 Grosvenor Place (Besse Property) (although it appears that they did get paid for the debris removed from the Perkins's property).  *See* Besse ROE Documents, attached as Exhibit 1.   The ROE executed by Brad Besse provided the Ashbritt's authorization to remove debris from the Besse Site, but it provided no basis to remove debris from the neighboring properties.  *Id.*

According to Mr. Corlew's deposition:

[*Counsel for Plaintiffs*] Q. Okay. Did they train you at all in recognizing property boundaries?

A. Well, what – the way it worked is that a prior team would go into a property, try to discover an ROE, and, as best they could, they would try to outline what they thought were the property boundaries. ...And there was not actual training on determining property boundaries, but normally they were roughly flagged prior...

Q. Okay. How did this prior team typically flag the boundaries?

A. They would have a little map, and they would have the ROE that was actually signed by the property owner, we actually had to have that signed ROE, or right of entry. ...Sometimes they would have flagging tape. Sometimes it would just be four rods with a piece of flagging tape.

Gregory Corlew Dep., 10:14-17, 10:18-20 & 22-25,11:6-11 & 24-25, 12:1 (Rec. Doc. 38-7 at 4-5);  Mr. Corlew later stated that no such crew had flagged the boundaries at the Besse site:

[*Counsel for Plaintiffs*] Q. ...So when you arrived at this property, had the prior team come and flagged the boundaries?

A. I don't believe so on this property, because they couldn't find the gas and stuff, the gas line...I mean, they had a rough map, and we did have that as part of our package; but we – I think we ended up spending a half a day...finding the gas line.

Gregory Corlew Dep., 30:11-21 (Rec. Doc. 38-7 at 13).

Also, contrary Ashbritt's assertions in its Memorandum in Support of Motion to Dismiss or for Summary Judgment at footnote 5 (Rec. Doc. 39 at 11), Mr. Corlew did not testify that the Besse site property owners came to the site to show the debris removal crew where the boundaries were *before* work commenced.

> [*Counsel for Plaintiffs*] Q: Let's take a look down a little further on the report. Under "QA comments," you mention here -- well, could you read to me what it says under QA comments.
>
> A. …QA comments. Okay. "Contacted property owner. Property owner and spouse came to property and  showed QC and myself approximate property boundaries. Because of all the debris, this  was difficult. We eventually decided 12 feet behind magnolia tree for the back and five feet to left of large pine up front. Owner also said he was not interested in saving the Jeep."
>
> Q. Okay. Just for clarification: When you say "property owner and spouse," did you mostly talk with the husband or with the wife? Which one represents --
>
> A. Both. Both.
>
> Q. Okay. So both of them were there, showing you and Sam Prince the boundary; is that correct?
>
> A. Well, not initially. This -- This happened after we had already started. I -- When I say  "contacted property owner," that was by phone.
>
> Q. Okay.
>
> A. And then they didn't get out till like a couple days later; but he did tell me by phone that, "Just take away the Jeep."

Gregory Corlew Dep., 29:8-11, 14-25, 30:1-10 (Rec. Doc. 38-7 at 12-13).   Mr. Corlew's testimony was that he did not ask the Besse site property owners to show him the boundaries until after Mrs. Perkins complained that they had exceeded the ROE.  (Gregory Corlew Dep., 32:6-15, 33:1-4 (Rec. Doc. 38-7 at 13-14)).  It is true that Mrs. Perkins testified that she did not dispute the description of the property boundaries in Mr. Corlew's report, as Ashbritt asserts.

Rec. Doc. 39 at 11, n. 5.  This does not affect Plaintiffs' claim that Ashbritt exceeded those boundaries.

Ashbritt allowed its agents to first fail to mark the boundaries and then exceed those boundaries, an act for which Ashbritt profited when it billed the USACE for debris removed from the wrong property.  While the contract between Ashbritt, Inc. and the USACE related to debris removal set forth authority for Ashbritt to remove debris from the Besse site in February 2006, the government provided no authority to remove debris from the Perkins site in February 2006.  In fact, the contract between the USACE and Ashbritt states:  "Under no circumstances will the Contractor mix debris hauled for others with debris hauled under this contract."  Rec. Doc. 38-2 at § C1.5.4, p. 15.

**E.**      ***Weggeman v. Ashbritt, Inc.*, Does Not Provide Relevant Precedent to Support Dismissal or Summary Judgment in the Perkins Matter.**

In support of their motion, Ashbritt has cited the case of *Weggeman v. Ashbritt, Inc.*, 2007 WL 2026820 (S.D. Miss. 2007) and attached the decision in that matter as Exhibit I to its Motion to Dismiss or for Summary Judgment (Rec. Doc. 38-11).  Ashbritt argues that the court should find that Ashbritt is immune under the FTCA because under the facts of the *Weggeman* case, the Court found that Ashbritt was entitled to derivative immunity as a government contractor.  However, the Southern District of Mississippi has heard several lawsuits against Ashbritt regarding this same contract.  *See* Pacer list, attached as Exhibit 2.   The decisions in each case must be considered according to its own facts.  Three of these cases bear a similarity to Plaintiffs' case, and a comparison further demonstrates that Ashbritt cannot claim Government Contractor immunity in this matter.

**1.      The Southern District of Mississippi Found that Ashbritt Was Not a Government Contractor for Purposes of Removal to Federal Court in City of Petal v. Ashbritt, Inc., and This Court Should Follow the City of Petal Decision Because the Same Contract is at Issue in This Litigation.**

In *City of Petal v Ashbritt, Inc.*, No. 2:08cv152 (S.D. Miss. Sept. 22, 2008) (attached as

Exhibit 3), the city of Petal, Mississippi sued Ashbritt Inc. for negligence.

> In its state court complaint, filed June 19, 2008, Petal alleges that Ashbritt acted negligently while engaged in the cleanup and removal process. Pl.'s St. Ct. Comp. at ¶¶ 6-7 [Doc. #1-3] (July 22, 2008). Specifically, Petal alleges that Ashbritt "negligently allowed enormous piles of saw dust and other shredded wood products to accumulate" and that this negligence caused the landfill debris pile to catch fire on consecutive days. *Id.* at ¶¶ 7-8.

> Petal filed suit in the Circuit Court of Forrest County, Mississippi, to recover for the costs it expended when it responded to the fires and monitored the debris plies. *Id.* at ¶ 11. Ashbritt removed the case to this Court on July 22, 2008, contending that the Court has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Def.'s Notice of Removal at ¶ 3 [Doc. #1]. Petal filed the instant motion to remand on August 5, 2008. [Doc. #4].

*City of Petal*, No. 2:08cv152, slip op. at 1-2.  The *City of Petal* Court found that, under the *same*

*contract* as that in the Perkins case at bar, the contract itself revealed that Ashbritt, rather than

the government, was primarily responsible for supervision of the debris cleanup and removal

process.  *Id.* at 8.  The *City of Petal* court further found that:

> Ashbritt has failed to meet its burden of establishing the existence of federal jurisdiction in this case, as it has not established that it was acting under color of federal office when it conducted the debris cleanup and removal.  The Court finds that the government merely entered the market to procure a service.  As a result, Ashbritt's removal was not justified under the federal officer removal statute."

*Id.* at 9.  This Honorable Court should similarly find that, under the contract at issue in the matter

currently before this court, Ashbritt cannot claim FTCA immunity.

**2.      The Case At Bar is Distinguishable from the Weggeman Decision.**

The *Weggeman* court, cited by Ashbritt, found that:

> AshBitt presents undisputed evidence that the U.S. Army Corps of Engineers directed AshBitt to clear and remove all disaster related construction and

> demolition debris from all **public property** in Hancock County. (Attachment 1 to Def. Mtn. to Dism.).  Plaintiff concedes that after the storm, his house was at least partially on Arkansas Street in Bay Saint Louis-public property in Hancock County, Mississippi. Ashbitt was therefore performing work within the specifications provided by the government when it removed the house from Arkansas Street. These undisputed facts will prevent Plaintiff from showing that AshBitt is not entitled to derivative immunity as a government contractor.

*Weggeman v. Ashbritt, Inc.*, 2007 WL 2026820  at *3 (S.D. Miss. 2007) (emphasis added).  The court also found that, "[i]f Plaintiff's claims in this case had been brought directly against the U.S. Army Corps of Engineers, Plaintiff would be unable to show a waiver of immunity."  *Id.*  The Perkins's personal property was not removed from public property, such as the middle of a street.  Ashbritt had no authority to come onto the Perkins's private property.  Furthermore, the *Weggeman* plaintiffs did not depose the USACE and thereby acquire evidence regarding the implementation of the contract.  In the case at bar, the deposition of Gregory Corlew, the USACE QA at the Besse site, clearly demonstrates that the government maintained minimal control over Ashbritt's implementation of the contract.  The *Weggeman* facts were dissimilar to the facts of the Plaintiffs' claims in the matter *sub judice*.

### 3.   The Case At Bar is Distinguishable from the **Ford** *Decision*.

The decision in *Ford v. Ashbritt, Inc.*, No. 1:08cv55, slip op. (S.D. Miss. Aug. 7, 2008) (attached as Exhibit 4) was based on the following facts and allegations:

> The storm moved Ford's house off of its foundation and placed it on the public right-of-way on Market Street in Pass Christian, Mississippi. Ct. R. 8-3 p. 3 ¶ 10. Ford alleges he was unable to remove the fishing equipment without the debris surrounding it being removed. He further alleges that although he authorized debris removal on his property, he also "delineate[d] certain items of personal property that [he] utilized in his commercial fishing business," so that those items would not be removed.  Compl. 3.  Nevertheless, AshBritt completely demolished and removed all structures and personal property from Ford's property.

*Ford v. Ashbritt, Inc.*, No. 1:08cv55, slip op. at 1.  Again, this involves a case where the personal property destroyed was located on public property (unlike the case *sub judice*).  In addition,

Ashbritt had authority to remove debris from that property pursuant to an ROE executed by the plaintiff property owner, Ford (also unlike the case *sub judice*, where Ashbritt trespassed on private property without an executed ROE for that property).  The *Ford* Court found that:

> AshBritt removed storm debris from Ford's property pursuant to a right of entry form executed by Ford. Ct. R. 8-3 p. 3 ¶ 10. Ford authorized AshBritt to enter the property "for the purpose of removing and clearing any and all storm-generated debris (and/or demolition and removal of unsafe structures). . . ." Ct. R. 11-3…
>
> AshBritt's evidence, including its contract with the Army Corps of Engineers and the affidavits of AshBritt supervisor Daniel Demidio, shows that there was no provision in the contract which would require AshBritt to distinguish "storm-generated debris" from non-debris. *See* Ct. R. 8-3; 8-4 p. 13; 15-2.  Demidio's affidavit states that before any debris was picked up, a Corps quality assurance person would advise AshBritt whether the debris was eligible for collection under FEMA guidelines, and would also monitor and supervise the collection of the debris. Ct. R. 8-3 p. 4. Thus, AshBritt's evidence is that it was following government specifications when it cleared Ford's property. Ford has submitted no conflicting evidence. The Corps' failure to set aside the items noted by Ford while having debris and wreckage removed from his property gives rise only to a claim of negligence in the performance of its work; a claim that the Court has found is barred by the Federal Tort Claims Act. It does not lead to the conclusion that AshBritt failed to follow government specifications. *See Dolphin Gardens, Inc. v. U.S.*, 243 F. Supp. 824, 827 (D.C. Conn. 1965) (cited in *Bynum*, 770 F.2d at 564). The Court therefore finds that AshBritt is entitled to derivative governmental immunity from Ford's claims. Accordingly, the Court lacks subject matter jurisdiction, and this suit must be dismissed.

These facts are distinctly different from those in the Perkins's matter.  Again, the *Ford* plaintiffs did not depose the USACE and thereby acquire evidence regarding the implementation of the contract, which, in the Perkins matter, clearly demonstrates that the government maintained minimal control over Ashbritt's implementation.    The case at bar should be distinguished from the *Ford* decision.

## F.    Conclusion

As discussed above, the government contractor defense provides derivative immunity to government contractors who are acting in accordance with specifications set by the federal

government and who are under the government's supervision. The very purpose of the government contractor defense is to provide immunity for a contractor when it is actually the government who is at fault and would be liable if not for its immunity. *See Trevino*, 865 F.2d at 1478. There can be no argument in this case that the government is at fault for this incident.

Ashbritt was an independent contractor with the government, hired to move debris after Hurricane Katrina. The government did not exercise sufficient control over Ashbritt to transform Ashbritt into a "government contractor," thereby shielding Ashbritt from immunity under the FTCA. Furthermore, since this immunity is derivative, it is a necessary prerequisite to the contractor obtaining immunity that the government be immune from liability had the government itself engaged in the action giving rise to the suit. Put another way, the act in question must be one that falls within the discretionary function of the government such that immunity would be necessary to preserve a "uniquely federal interest." *See Boyle*, 487 U.S. at 504-07. The case at bar presents no such interest. Ashbritt cannot escape liability under the government contractor defense.

## II.  There is Sufficient Evidence to Support the Plaintiffs' Allegations.

### A.  Ashbritt Cannot Blame Its Subcontractors Where Ashbritt Was the Responsible Prime Contractor.

Ashbritt has not provided any evidence to suggest that anyone other than Ashbritt managed the debris removal activities at the Besse site, either in their Rule 26 disclosures or at any other point during the discovery period. The Besse ROE documents (attached as Exhibit 1) indicate that Ashbritt conducted the debris removal as the contractor to the government. The equipment at the site was emblazened with "Ashbritt" signs. *See* Portions of A. Perkins Dep. and Photograph Exhibits from Gregory Corlew Dep., attached as Exhibit 5. The contract states that Ashbritt is responsible for the crew at the debris removal site, and for their subcontractors:

- The Contractor shall provide specified equipment, operators, and laborers for debris removal operations as specified in the task order. The contractor shall provide all labor and materials necessary to fully operate and maintain (including fuel, oil, grease and repairs) all equipment under this contract. Rec. Doc. 38-2 at § C1.2.1, p. 14.

- The Contractor shall provide debris removal crews for each disaster event for the number of days specified..." Rec. Doc. 38-2 at § C1.2.2, p. 14.

- The Contractor shall supervise and direct the work, using skilled labor and proper equipment for all tasks. Safety of the Contractor's personnel and equipment is the responsibility of the Contractor. Additionally, the Contractor shall pay for all materials, personnel, taxes and fees." Rec. Doc. 38-2 at § C1.7.2, p. 16.

- The Contractor shall be responsible for correcting any notices of violations issued as a result of the Contractor's or any subcontractor's actions or operations during the performance of the contract. Rec. Doc. 38-2 at § C1.7.4, p. 16.

- The prime contractor is solely responsible to assure the safety of contract personnel in all contract activities that they and their subcontractors perform. The contractor shall also provide and take necessary measures to protect the public and Corps personnel during their activities. Actions may include but are not limited to providing flagman, ground guides, fencing, security guards, traffic control, removal of unsafe equipment and removal of unsafe workers. Rec. Doc. at § H.5. ¶ 1, p. 29-30.

- **The Contactor is responsible for damage to property caused by defective workmanship.** The Contractor shall promptly segregate and remove from the premises any unsatisfactory facilities, materials, and equipment used in contract performance, and promptly replace them with satisfactory items. If the Contractor fails to proceed at once in a workmanlike manner with performance of the work or with the correction of defective workmanship, the Government may (1) by contract or otherwise, replace the facilities, materials, and equipment or correct the workmanship and charge the cost to the Contractor and (2) terminate for default the Contractor's right to proceed. The Contractor and any surety shall be liable, to the extent specified in the contract for any damage or cost of repair or replacement. Rec. Doc. at § H.5. ¶ 1, p. 29-30. (Emphasis added.)

If Ashbritt had relationships with any subcontractors in this case, Ashbritt has not provided information about them in discovery, despite Plaintiffs' requests for such information. Ashbritt's argument that the Plaintiffs "should know" who these subcontractors were because Mr. Corlew testified about that issue ignores that fact that Mr. Corlew was not sure which workers were employed by which companies or how they had been subcontracted, while he was clearly under the impression that Ashbritt managers were in charge of the site.

[*Counsel for Plaintiffs*] Q: Okay. On the top of this report, "QC, Sam Prince," you have a little notation above his name. What does that say?

A: Okay. Sam – that's Hemphill, and that was the actual company, I think, that was hiring the QCs. You know, the need for the QCs was extraordinary at that time, there was quite a few of them, and they were generally locally – locals in the area. And so Hemphill – I think, but I can't say for sure – Hemphill was the employment agency that was handling the hiring of the QCs.

...

Q: Okay, they were subcontracted by who, Ashbritt or by the Corps of Engineers?

A: I'm not sure. I'm not sure of that, how it worked. I wasn't privy to that.

...

Q: ...What is LS Enterprises No. 13?

A: That is the subcontractor doing the actual debris removal.

...

Q: You have a name there, John Bourgeois?...Who did he work for?

A: He was a – Let's see. I think it might be – you could refer to him as like a district supervisor, and he worked for Ashbritt, and he was called whenever there was a problem with a property owner.

Q: Okay. Do you see there's another name there too, Joe?

A: Yeah. Joe was the immediate supervisor for Sam Prince.

Q: So do you know who he worked for?

A: Yeah. He worked for Ashbritt as well.

Q: Did Ashbritt supervise LS Enterprises too or...

A: Well, Ashbritt provided the ROE...and hired the subcontractor. And I don't know exactly how Ashbritt – how everything was ironed out, but the supervisors – and this is strictly an assumption – I believe, they worked for Ashbritt, simply to police or supervise the subcontractors.

24:5-16, 25 & 25:1-3, Rec. Doc. 38-7 at 10; 25:16-17, 25 & 26:1, 8-25 & 27:1-3, Rec. Doc. 38-7 at 11.   Mr. Corlew was clearly not in a position to state definitively which people worked directly for Ashbritt and which people worked for one of Ashbritt's subcontractors. Furthermore, there are dozens of "Hemphill's" and "LS Enterprises" of various stripes registered as businesses throughout the United States. Ashbritt has refused to provide any further information about their subcontractors, despite Plaintiffs' requests.

If Ashbritt hired employees from other companies to complete the work, this is of no moment.  Ashbritt was responsible for the debris removal at the Besse site under its contract, and Ashbritt represented to the world, including Plaintiffs, that it was conducting the work.

**B.      Ashbritt's other bases for dismissal or summary judgment amounts to an attack on the disputed facts of the case.**

First, Ashbritt cannot rely on the absence of certain facts in Mrs. or Mr. Perkins's depositions as proof that no such evidence exits.  It was not the party deponents' responsibility to provide their entire anticipated trial testimony at the pre-trial deposition.  Rather, it was the responsibility of Ashbritt and the USACE to ask questions, and the party deponents were only required to answer those questions actually asked. Ashbritt cannot carefully choose which questions to ask (or not ask), and then cite the *absence* of certain questions and answers as evidence.

Second, Ashbritt implies that the failure to hire an expert adjuster is fatal to the Perkins's testimony.  Mrs. Perkins has provided numerous documents regarding these items in discovery, including hundreds of photographs, a police report, a Form 95 claim for damages filed with the USACE, and detailed lists of the property in her house, all of which Ashbritt ignores when it states that the Plaintiffs have provided *no* evidence.  Mrs. Perkins gave lengthy testimony on this issue when questioned by the USACE, giving detailed statements about the property that was

destroyed.  *See* Arlene Louise Perkins Deposition, Rec. Doc. 38-8 at 34-74.  Mrs. Perkins knows

how much she paid for the specific items she that she seeks compensation for, because she chose

and purchased these items herself.  *Id.*  Mrs. Perkins knew where each item was located in the

house because she personally participated in building and installing these items in her house.  *Id.*

Mrs. Perkins managed to salvage similar items that were not destroyed by Ashbritt, and she

knows how much it would have cost her to replace them.  *Id.*  Mrs. Perkins visited her home after

Hurricane Katrina many times, and knew the location and condition of these items.  *Id.*  Ashbritt

is now of the opinion that Mrs. Perkins was not specific enough in her deposition, but it was

Ashbritt's responsibility to ask follow-up questions, not Mrs. Perkins's responsibility.

Furthermore, an expert is not required to testify on facts where the party has personal knowledge

of those facts.

On the other hand, Ashbritt has failed to hire an adjuster to determine the value of these

items, although Ashbritt has no such personal knowledge.  Mrs. Perkins and Mr. Perkins have

submitted hundreds of pages of photographs and documentation in discovery regarding the value

of this property.  The extent to which Mrs. and Mr. Perkins's memory and testimony on these

facts is reliable should be determined by the trier of fact, not by the opposing party, Ashbritt.

Third, Mrs. Perkins's deposition testimony clearly establishes that Mrs. Perkins arrived at

the site to discover the debris removal crew trespassing on her property and destroying her home.

> [*Counsel for USACE*] Q: Okay.  Tell me what you observed when you arrived on the -- around the mid morning time of February the 10th, 2006.
>
> A: I got out of my car.  I walked over to this person.  I'm very bad with  names, so I don't know who it is.  I   introduced myself.  I said we're here to meet for whatever.  And then I heard the machines over   by where my house was.  I freaked.  I panicked.  I ran across the debris field stepping on at least half a dozen nails, never stopping.  I ran as fast as I possibly could.  And I saw an excavator sitted where my living room, studio boundary was reaching into the studio, pulling out more stuff. I went underneath the excavator.  What?  Am I crazy? Screaming at this person in the thing to stop, it has my artwork in it.  I want

what's in this little excavator little things.  I am screaming at him to stop.  Of course he can not hear me.  I am   thinking I am about to be killed because  he's moving his excavator one direction to empty it.  He's about to come back to me.  I do not care.  I am screaming at this man to stop and give me my stuff back, like an idiot.

Q: All right.  The excavator that was being operated on that occasion, was it on your property?

A: Yes.

Q: How far into your property would you estimate the excavator was at the time that you observed it?

A: I measured it with a tape.  The tape, the track marks afterwards, 60 feet.

Q: How long had the excavator been in that area?

A: I do not know.

Q: Did anyone ever tell you or did you ask how long he had been operating in that area?

A: I did not ask.

Q: Do you know today when they began operating in that area?

A: I do not know.

Q: The area where the excavator, where you first observed the excavator was, you testified was 60 feet from the property line; is that correct?

A: Uh-huh (affirmative reply).

Q: How is it that you know where your property line was at that time?  Was it marked in some fashion or –

A: There were remnants of the fence farther north.

Q: And you made your measurements from the fence, from the remnants of the fence to the area where the excavator was, the tracks, correct?

A: The tracks.

Q: All right.  Do you know who was operating the excavator?

A: I do not know.

Q: Were there any markings on the excavator to indicate to you who, who owned the excavator?

A: I took pictures.

Q: All right.  And we've been provided with copies of the, of the excavator that you took pictures of.  Did anyone tell you whose excavator that was?

A: I do not know.

Q: Do you know who the operator was employed by that was operating the excavator?

A: I do not know.

Q: Did the excavator eventually stop operations after you arrived and began waving your hands and arms and shouting at the operator?

A: Yes.

108:6-25; 109:1-25, 110:1-25, 111:1-13 (Rec. Doc. 38-8 at 96-99).  Mrs. Perkins has clearly established facts sufficient to support her claim against Ashbritt.  Her claims should not be dismissed merely because Ashbritt disputes these facts.  In fact, because Ashbritt is contesting material facts, summary judgment is inappropriate under Federal Rules of Civil Procedure 12 and 56.

**Conclusion**

In sum, the government did not sufficiently control Ashbritt's activities so that this tort is the government's responsibility rather than Ashbritt's.   Ashbritt cannot try to blame this tort on the subcontractors Ashbritt was supervising, and whom Ashbritt has not even identified.  The Plaintiffs have provided evidence necessary to establish their claim, and Ashbritt cannot rely on contested facts to force a dismissal or summary judgment.

The crux of the matter is that Ashbritt and the Plaintiffs now dispute two main areas of material fact in this litigation: (1) the extent to which Ashbritt trespassed in order to improperly remove salvageable building materials and personal property without permission from the

Perkins's property (for which Ashbritt profited), and (2) the value of that property.  These are issues for the trier of fact, not for dismissal or summary judgment under Federal Rules of Civil Procedure 12 and 56.

Defendant Ashbritt's Motion to Dismiss or for Summary Judgment (Rec. Doc. 38) should be denied.

Respectfully Submitted this 27th day of February, 2009.

F. Gerald Maples, P.A.

/s/Machelle R. Lee Hall
F. Gerald Maples, T.A. (MS Bar #1860)
    federal@geraldmaples.com
Machelle R. Lee Hall (*pro hac vice:* 45549)
F. Gerald Maples, P.A.
365 Canal Street; Suite 2650
New Orleans, LA 70130
Telephone:    504.569.8732
Facsimile:    504.525.6932

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 27th of February, 2009 electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following ecf parties:

Stephen Graben stephen.graben@usdoj.gov

Patrick Bergin patrick.bergin@butlersnow.com

John Wilson Eaton, III  wilson.eaton@butlersnow.com

There are no non-ecf parties.

/s/    Machelle R. Lee Hall
Machelle R. Lee Hall